**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

ONIONS ETC., INC.,

        Plaintiff,

v.

Z & S FRESH, INC.,

        Defendant,

  And

FRESNO-MADERA FEDERAL LAND
BANK ASSOCIATION, FCLA, a
corporation existing and operating under
the Farm Credit Act of 1971, as amended,

        Intervenor-Defendant -
Appellee,

  V.

ARON MARGOSIAN and CARRIE
MARGOSIAN,

        Cross-Defendants -
Appellants.

No. 12-16813

D.C. No. 1:09-cv-00906-AWI-
MJS

MEMORANDUM[*]

---

     [*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Appeal from the United States District Court
for the Eastern District of California
Michael J. Seng, Magistrate Judge, Presiding

Argued and Submitted November 19, 2014
San Francisco California

Before: BERZON and RAWLINSON, Circuit Judges and BUCKLO,[**] Senior District Judge.

The Fresno-Madera Federal Land Bank Association, FCLA ("Land Bank") sued Aron and Carrie Margosian for breaching their guaranty of a $4.8 million restructured loan made to ZM Fresh Special T's, Inc. ("ZM"), formerly known as ZMC Fresh, Inc. The Margosians asserted cross claims alleging that the Land Bank (1) misrepresented that the guaranty would not expose the Margosians to personal liability for ZM's indebtedness and (2) obtained their signatures on the guaranty by fraudulently concealing known facts about ZM's precarious finances. The district court granted summary judgment for the Land Bank and entered a $3.4 million judgment against the Margosians. We reverse in part, affirm in part, and remand.

---

[**] The Honorable Elaine E. Bucklo, Senior District Judge for the U.S. District Court for the Northern District of Illinois, sitting by designation.

2

**1.** With regard to the fraudulent misrepresentation claim, the district court held that *Bank of America v. Pendergrass*, 4 Cal. 2d 258 (1935), "precludes the Margosians from introducing parol evidence of a promise directly at variance with the promise in the written agreement." *Onions Etc., Inc v. Z & S Fresh, Inc.*, 880 F.Supp.2d 1092, 1108 (E.D. Cal. 2012). The California Supreme Court has overruled *Pendergrass,* so our review takes full account of the parol evidence that the district court discounted. *See Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169 (2013).

On the merits, the Margosians' fraudulent misrepresentation claim turns on whether they "justifiabl[y] reli[ed]" on the Land Bank's verbal assurance that signing the guaranty would not make them personally liable for ZM's restructured loan.[1] *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) (quoting *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1091, 1108 (1988)). The California

---

[1] The Margosians recognize that justifiable reliance is a common element in all of their cross claims against the Land Bank except the fraudulent concealment claim addressed *infra* at § 2. *See* Appellant's Reply Br. at 12.

3

Supreme Court has cautioned that "[e]xcept in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *Id.* (quoting *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1475 (1984)). That is, summary judgment is appropriate only when "reasonable minds can come to only one conclusion based on the facts." *Id.*

Viewing the evidence in the light most favorable to the Margosians–as we must at the summary judgment stage–the record leaves ample room for a "reasonable difference of opinion" about whether they reasonably relied on the Land Bank's misrepresentations. *Id.*

According to the Margosians, in October or November 2008, Martha Hugger, a Land Bank Vice President and Loan Documentation Manager, called the Margosians unexpectedly on the pretense that she happened to be in the area and needed to discuss a "simple formality" with them. Hugger arrived at the Margosians' home with Rob Frudden, a Land Bank Vice President and Senior

4

Loan Officer. Frudden had sent the Margosians two letters in July 2008 advising

them that ZM's original loans–which the Margosians had personally

guaranteed–were or may be distressed. Perhaps anticipating that the Margosians

had ignored or forgotten about Frudden's letters–which plainly identified him as a

Land Bank Vice President–Hugger introduced Frudden as a new trainee who was

just there to observe.

Hugger set a casual tone for the meeting and "talked quite a lot about

everything else except th[e] simple formality" that prompted her visit. When

Hugger eventually presented the guaranty to the Margosians for signature, Carrie

Margosian asked what would happen if ZM struggled financially. Hugger initially

dodged the question. When Carrie Margosian pressed for an answer, Hugger said

the Land Bank could only foreclose on the loan's collateral–i.e., ZM's newly

constructed warehouse–and would recover any deficiency from two other

guarantors: (1) Martin Zaninovich, who co-owned ZM along with Aron

Margosian, and (2) Z & S Fresh, Inc. ("Z&S"), a wholesale distribution company that Zaninovich owned by himself. With that reassurance, the Margosians signed a seven-page, single-spaced "Restructure Agreement" identifying them as guarantors and an eight-page, single-spaced "General Continuing Guaranty" purporting, by negative implication, to expose them to personal liability.[2]

According to the Land Bank's own records, the meeting at the Margosians' home lasted only thirteen minutes. After the meeting, Frudden congratulated Hugger for "helping Mrs. Margosian, whom [sic] was a little overwhelmed, get comfortable with all of the documents and getting her signature."

The district court characterized the Land Bank's alleged actions as "disconcerting," but gave this evidence insufficient weight when applying the summary judgment standard. *Onions Etc.*, 880 F.Supp.2d at 1103. To the extent

---

[2] In connection with ZM's restructured loan, Aron Margosian also signed (1) a twelve–page "Loan Agreement"; (2) an eight-page "Installment Promissory Note"; (3) a twenty-one page "Deed of Trust"; and (4) a six-page "Security Agreement." It is not clear from the record whether Aron Margosian signed these documents when Hugger and Frudden made an unexpected visit to his home or on another occasion.

6

the district court faulted the Margosians for not reading or understanding the personal liability provision of the guaranty, a finding of negligence is not fatal to their fraudulent misrepresentation claim. *See Rothwell*, 10 Cal. 4th at 1239-40 ("'Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.'" (quoting *Seeger v. Odell*, 18 Cal. 2d 409, 414 (1941))).

On the factual record developed below, a judge or jury could find that the Margosians acted reasonably. Only someone with extraordinary fortitude and sophistication would *not* have succumbed to the Land Bank's pressure tactics (as depicted by the Margosians' evidence)–i.e., calling out of the blue and asking to make an unscheduled visit to the Margosians' home, misleading the Margosians as to Frudden's position, characterizing the purpose of the visit as a simple formality, and giving a false answer to Carrie Margosian's question about personal liability. At a minimum, summary judgment was not appropriate because a jury could credit

7

the Margosians' version of events, and if it does, there is "room for a reasonable difference of opinion" about whether the Margosians justifiably relied on Hugger's assurance that they would not be personally liable for ZM's restructured loan. *Id.* at 1239.

**2.** The Margosians' other cross claim alleges that the Land Bank fraudulently concealed materials facts about ZM's precarious financial condition before asking them to guarantee the $4.8 million restructured loan.

Under California law, a creditor must disclose known facts about a debtor's finances to a prospective surety when, among other things, "the creditor 'has reason to believe that the facts are unknown to the surety.'" *Sumitomo Bank of Cal. v. Iwasaki*, 70 Cal. 2d 81, 93 (Cal. 1968) (quoting Restatement (First) of Security § 124(1) (1941)). Restatement (Third) of Suretyship & Guaranty § 12 (1996)—which expressly derives from Restatement (First) of Security § 124(1)—explains that "whether the obligee has reason to believe that…facts are unknown to the secondary obligor[] shall be determined in light of the obligee's

8

reasonable beliefs as to (a) the nature of the secondary obligor's relationship to the principal obligor; (b) the nature of the secondary obligor's business; and (c) the secondary obligor's ability to obtain knowledge of such facts independently in the exercise of ordinary care." *Id*. § 12(4). Importantly, the Restatement's commentary emphasizes that a creditor's duty to disclose "places no burden on the obligee to investigate for the benefit of the secondary obligor. Nor does it require the obligee to take any particular steps to ascertain whether the secondary obligor is acquainted with facts that the obligee may reasonably believe are known to both of them." *Id*. § 12(3) cmt. f.

In May 2008, almost six months before the Land Bank asked the Margosians to guarantee ZM's restructured loan, Frudden prepared a Credit Analysis Report in which he concluded that: (1) ZM was financially dependent on Z&S, Zaninovich's wholesale distribution company; (2) Z&S's bank had instructed the company to stop using its $5.5 million line of credit to prop up ZM and related entities; and (3)

9

ZM could not "stand alone" financially and would continue to "drain[]" Z&S to pay its existing loans.

At the summary judgment stage, the Margosians' fraudulent concealment claim turns on whether a reasonable judge or jury could find that the Land Bank had reason to believe they were unaware of ZM's precarious financial position before they guaranteed the $4.8 million restructured loan. The record does not support such a conclusion, even after viewing the evidence in the light most favorable to the Margosians.

In November 2007, Aron Margosian signed a loan agreement, promissory note, and security agreement with the Land Bank identifying himself as ZM's "Treasurer." When ZM accepted the Land Bank's proposal for a restructured loan in August 2008, Aron Margosian certified that he was ZM's "Secretary" and "Chief Financial Officer/Treasurer." It was reasonable for the Land Bank to presume from Aron Margosian's officer titles that he was familiar with ZM's financial statements and, by extension, its financial dependence on Z&S's

10

operating line of credit.  At a minimum, the Land Bank was entitled to presume that Aron Margosian had the "ability to obtain knowledge of such facts independently in the exercise of ordinary care."  Restatement (Third) of Suretyship & Guaranty § 12(4)(c).  Indeed, from the Land Bank's perspective, ZM's Treasurer/CFO was in a better position than the Bank's loan officers to understand the company's financial position.

The written correspondence between the Land Bank and the Margosians also provided no reason for the Bank to think they were unfamiliar with ZM's finances before guaranteeing the restructured loan.  The Land Bank advised the Margosians in July 2008 that ZM's original loans were or may be distressed and informed Aron Margosian that ZM's verbal request for a new loan was rejected because of concerns about the company's finances.  The Margosians then signed an "Application for Restructure" in early August 2008 "acknowledge[ing] and consent[ing] to their continued liability for this loan."  This sequence of events

11

suggests that the Margosians understood the distressed status of ZM's existing loans and accepted the Land Bank's refinancing proposal to avoid default. In other words, from the Land Bank's perspective, the Margosians were apparently informed rather than ignorant about the underlying reality concerning ZM's finances.

Although the Margosians revealed themselves to be unsophisticated in certain respects when they signed the guaranty, their questions to Hugger stopped short of giving her reason to believe they were unaware of ZM's finances or the status of its existing loans. Moreover, neither Frudden nor Hugger was required to "take any particular steps to ascertain whether the [Margosians were actually] acquainted with facts that the [Bank] may reasonably [have] believe[d] [were] known to both of them." Restatement (Third) of Suretyship & Guaranty § 12(3) cmt. f.

In sum, no reasonable judge or jury could find that the Land Bank had reason to believe that the Margosians were unaware of ZM's precarious finances

12

before they guaranteed its $4.8 million restructured loan. It follows that the Land Bank was entitled to summary judgment on the Margosians' fraudulent concealment claim.

**3.** In dicta, the district court opined that the Land Bank is statutorily immune from punitive damages because it is a "federal agency" under the Federal Tort Claims Act. *See* 28 U.S.C. § 2671. Over thirty years ago, this Court held that a federally chartered institution like the Land Bank with a "sue and be sued" clause in its enabling legislation, *see* 12 U.S.C. § 2093(4), cannot be sued for punitive damages unless Congress expressly waives its statutory immunity. *See In re Sparkman*, 703 F.2d 1097, 1101 (9th Cir. 1983). On appeal, the Margosians argue that *Sparkman* is no longer good law. *See McGee v. Tucoemas Fed. Credit Union*, 153 Cal. App. 4th 1351, 1359 (2007) (noting that "the *Sparkman* analysis is inconsistent" with the Supreme Court's "contrary analytical framework in *FDIC v.*

13

*Meyer*" 510 U.S. 471, 480 (1994)).  The district court should consider this

argument in the first instance on remand.

*  *  *  *  *

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

*Fresno-Madera Fed'l Land Bank v. Margosian*, Case No. 12-16813
**Rawlinson, Circuit Judge, dissenting:**

I respectfully dissent from that portion of the disposition concluding that a material issue of fact exists regarding the Plaintiffs' fraudulent misrepresentation claim.

In determining whether an adequate showing of justifiable reliance has been made, California courts distinguish between fraud in the inducement of a contract and fraud in the execution of a contract. *See Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 291 P.3d 316, 325 n.11 (Cal. 2013); *see also Duick v. Toyota Motor Sales, U.S.A., Inc.*, 198 Cal. App. 4th 1316, 1320-21 (2011). "Fraud in the inducement occurs when the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*." *Julius Castle Rest., Inc. v. Payne*, 216 Cal. App. 4th 1423, 1440 (2013) (citation, alteration and internal quotation marks omitted) (emphases added). Fraud in the inducement addresses facts external to the terms of the contract. *See id*.

Fraud in the execution occurs when the alleged misrepresentation "induces conduct that appears to be a manifestation of assent *by one who neither knows nor has a reasonable opportunity to know* of the character or essential terms of the

1

proposed contract . . ." *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 420 (1996) (citation omitted) (emphasis in the original). If a party with a reasonable opportunity to know the character and essential terms of a contract "fails to learn the nature of the document he or she signs," failure to read the contract "precludes a finding the contract is void for fraud in the execution." *Id*. at 423 (citation omitted).

Plaintiffs asserted a claim predicated on fraud in the execution. They contended that Land Bank failed to disclose the fact that the documents they were signing included a guaranty. There is no evidence in the record that Land Bank representatives "took some action or said something to hurry or pressure" the Plaintiffs into signing the guaranty agreement. *Id*. at 424 n.12. The Plaintiffs were given the opportunity to read the documents and expressed awareness that they were signing a guaranty. Accordingly, no material issue of fact was raised regarding the existence of extrinsic fraud. *See id.* at 420. I would affirm the district court's entry of summary judgment in favor of Land Bank in its entirety.